## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KENNETH GIBSON and AMANDA GIBSON,<br><br>       *Plaintiffs,*<br><br>  vs.<br><br>3M COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC., ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT; CARRIER GLOBAL CORPORATION; CHEMGUARD, INC.; DYNAX CORPORATION; E. I. DU PONT DE NEMOURS & CO.; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION GROUP, INC.; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC., PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TEN CATE PROTECTIVE FABRICS USA D/B/A SOUTHERN MILLS INC.; THE CHEMOURS COMPANY L.L.C.; TYCO FIRE PRODUCTS, L.P.; W. L. GORE & ASSOCIATES, INC. and NORTHEAST RESCUE SYSTEMS, INC.,<br><br>       *Defendants.* | Case No. _1:22-10503_____<br><br><br>**NOTICE OF REMOVAL**<br><br><br>**JURY TRIAL DEMANDED** |

Defendants Tyco Fire Products LP, Chemguard, Inc., and 3M Company (the "Removing Defendants"), by and through undersigned counsel, hereby give notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Superior Court of the Commonwealth of Massachusetts, Suffolk County, to the United States District Court for the District of Massachusetts. As grounds for removal, the Removing Defendants allege as follows

on personal knowledge as to their own conduct and status and on information and belief as to all other matters:

## **PRELIMINARY STATEMENT**

1.      Plaintiffs seek to hold Removing Defendants and certain other Defendants liable based on their alleged conduct in designing, manufacturing, and/or selling aqueous film-forming foam ("AFFF") that Plaintiff Kenneth Gibson (whom the Complaint refers to as "Firefighter Plaintiff") allegedly used during his employment as a firefighter, including while working for the cities of West Roxbury and Boston, Massachusetts.

2.      Specifically, Plaintiffs allege that per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), were contained in Removing Defendants' AFFF; that Firefighter Plaintiff used AFFF in the course of performing firefighting duties and training; and that PFAS from AFFF caused Firefighter Plaintiff's injuries.

3.      At least some of the AFFF that Firefighter Plaintiff allegedly used in training or in fire suppression during his firefighting career has been manufactured by a select group of suppliers (including Tyco, Chemguard, and 3M) in accordance with the military's rigorous specifications ("MilSpec AFFF"). Under the federal "government contractor" defense recognized in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), the Removing Defendants are immune to tort liability for their design and manufacture of MilSpec AFFF and their provision of warnings for the product. Under the federal officer removal statute, 28 U.S.C. § 1442, the Removing Defendants are entitled to remove this action in order to have their federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual

2

relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## **BACKGROUND**

4.      This action was filed on February 15, 2022, in the the Superior Court of the Commonwealth of Massachusetts, Suffolk County, bearing Case No. 2284CV00353. (Ex. A, Complaint).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 101 and 1441(a) because the Superior Court of the Commonwealth of Massachusetts, Suffolk County, is located within the District of Massachusetts.

5.      Tyco Fire Products LP was served with the Complaint on March 17, 2022. 3M was served with the Complaint on March 25, 2022.  Removal is timely under § 1446(b)(1).

6.      The Removing Defendants are not required to notify or obtain the consent of any other Defendant in this action to remove this action as a whole under § 1442(a)(1).  *See, e.g.,* *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Linden v. Chase Manhattan Corp.*, 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

7.      Plaintiffs generally allege that Defendants (including the Removing Defendants) have manufactured, marketed, or sold AFFF products containing PFAS, and that the PFAS in these AFFF products caused Plaintiffs' injuries. (Compl. ¶¶ 2–12, 15, 22, 38, 47-52, 60-69).

8.      Plaintiffs seek monetary damages for harm allegedly "resulting from exposure" to PFAS "that were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by each of the Defendants." (*Id.* ¶ 3). Plaintiffs also seek "any appropriate injunctive or other equitable relief," in addition to other damages as available under state law. (*Id.* ¶ 12; Prayer for Relief at 74).

3

9.      Plaintiffs assert claims against all Defendants for breach of implied warranty of merchantability – design defect (*id.* ¶¶ 160–178), breach of implied warranty of merchantability – failure to warn (*id.* ¶¶ 179–201), negligence (*id.* ¶¶ 202–221), loss of consortium (*id.* ¶¶ 222–226), and deceptive trade practices (*id.* ¶¶ 227–231).

10.     Pursuant to 28 U.S.C. § 1446(d), the Removing Defendants are serving a copy of this Notice of Removal upon all other parties to this case and are filing a copy with the Clerk of the Superior Court of the Commonwealth of Massachusetts, Suffolk County.

11.     By filing a Notice of Removal in this matter, the Removing Defendants do not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and the Removing Defendants specifically reserve the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

12.     The Removing Defendants reserve the right to amend or supplement this Notice of Removal.

### REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442

13.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *cf. Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Papp*, 842 F.3d at 812;

4

*Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187, 196 (D. Mass. 2008); *Isaacson*, 517 F.3d at 135; *Durham*, 445 F.3d at 1251.

14.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted).

15.     All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are caused at least in part by MilSpec AFFF. *See, e.g., Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against Tyco and other manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF[,] . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against Tyco and other manufacturers of MilSpec AFFF). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on multiple

5

occasions that removal under § 1442 is proper where the notice of removal alleges that plaintiffs' injuries are caused, at least in part, by MilSpec AFFF. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1"), at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[1]

**A.    MilSpec AFFF**

16.    Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields (including Air National Guard facilities), and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF in response to catastrophic fires aboard the aircraft carriers *USS Forrestal* in 1967 and *USS Enterprise* in 1969.[2] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

17.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable

---

[1] Following removal, the Removing Defendants intend to designate this action for transfer to the MDL.

[2] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

[3] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4] All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[5] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6] Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

18.     From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here. This requirement has been in force for virtually the entire time period at issue in the Complaint. In 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term." PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and

---

[4] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[5] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[6] *Id.*

the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

**B.** **Firefighter Plaintiff's Exposure to PFAS from MilSpec AFFF**

19. The Complaint specifically alleges that Firefighter Plaintiff used and was exposed to MilSpec AFFF and that his injuries derive in part from that product. Paragraph 111 of the Complaint states: "Below are photos typical of the Class B foam containers manufactured, marketed, distributed, or sold by Defendants in Massachusetts that Firefighter Plaintiffs [*sic*] used in training or in fire suppression during their firefighting careers [*sic*]." One of the photos that follows is a photograph of a container of Light Water AFFF 6% Concentrate, the labeling of which states "Meets requirements of MIL-F-24385C." "MIL-F-24385C" was a DoD MilSpec for AFFF. "Light Water" is a trade name for AFFF previously used by 3M.

20. To be clear, the Removing Defendants deny that PFAS from any source caused Plaintiffs' alleged injuries. But to the extent that Plaintiffs allege claims and present evidence to the contrary, the Removing Defendants intend to defend themselves on the ground that Plaintiffs' injuries were caused at least in part by Firefighter Plaintiff's exposure to an alternative PFAS source for which the Removing Defendants have no legal liability—PFAS originating in MilSpec AFFF.

**C.** **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

*1.* *The "Person" Requirement Is Satisfied*

21. The first requirement for removal under the federal officer removal statute is satisfied here because Tyco (a limited partnership) and Chemguard and 3M (corporations) meet the definition of "persons" under the statute. For purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships." *Papp*, 842 F.3d at 812

8

(quoting 1 U.S.C. § 1); *accord Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson*, 517 F.3d at 135–36.

### 2. *The "Acting Under" Requirement Is Satisfied*

22.     The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer. *Papp*, 842 F.3d at 812.  The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted).  Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.  Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government.*" *Sawyer*, 860 F.3d at 255 (emphasis in original).

23.     The requirement of "acting under" federal office is met here because the effect of Plaintiffs' claims, at least in part, is to challenge the Removing Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137.  MilSpec AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137.  The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates

9

and agents to achieve improvements in formulations."[7]  Accordingly, the military has long depended upon outside contractors like Tyco, Chemguard, and 3M to develop and supply AFFF. *See Chemguard*, 2021 WL 744683, at *3 (holding that Tyco and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, at 3–6 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6 (same).  If Removing Defendants and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself.

24.    In designing, manufacturing and supplying the MilSpec AFFF at issue, the Removing Defendants acted under the direction and control of one or more federal officers. Specifically, the Removing Defendants acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[8]

### 3. *The Nexus Requirement Is Satisfied*

25.    The third requirement, that the defendant's actions taken under color of federal office have a causal nexus with plaintiff's claims or injuries or be otherwise related to the lawsuit,

---

[7] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

[8] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

4891-5951-7466 v.1 058487/00001, 8:59 AM, 04/06/2022

erects a hurdle that "is quite low." *Isaacson*, 517 F.3d at 137.[9]  To show the required nexus, it is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office. *Sawyer*, 860 F.3d at 258.

26.    Here, Plaintiffs' claims arise in part from Firefighter Plaintiff's alleged exposure to PFAS in AFFF.  Plaintiffs' own allegations and those of the Removing Defendants show that the PFAS to which Firefighter Plaintiff was allegedly exposed derives in part from MilSpec AFFF.  The Removing Defendants contend that the use of PFAS in MilSpec AFFF was required by military specifications.  The conflict is apparent: MilSpec AFFF was developed by the Removing Defendants and other manufacturers to meet specifications established by the DoD.  The design choices Plaintiffs are attempting to impose via state tort law would create a conflict in which the Removing Defendants could not comply with both the MilSpec and the purported state-prescribed duty of care. *See Boyle*, 487 U.S. at 509; *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'causal connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1 at 5–6 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court . . . finds that the causation element of federal officer removal is satisfied here."); MDL Order 2 at 5 (finding the causation element of federal officer removal satisfied where Tyco and Chemguard's AFFF products, "for which the military imposes MilSpec standards," were used at several Part 139 airports); MDL Order 3 at 5–6 (same as to MilSpec AFFF used at a single airport).

---

[9] The "acting under" and "under color of" prongs overlap.  Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

27.      Here, Plaintiffs' purported injuries arise at least in part from MilSpec AFFF.  The causal connection or relationship between Plaintiffs' alleged injuries and the Removing Defendants' actions under color of federal office is clear.  It is irrelevant that Plaintiffs do not expressly contend that their injuries derive solely from MilSpec AFFF; the fact that some portion of the alleged injuries could plausibly derive from MilSpec AFFF is sufficient.  Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Chemguard*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present").

4.      *The "Colorable Federal Defense" Requirement Is Satisfied*

28.      The fourth requirement ("colorable federal defense") is satisfied by the Removing Defendants' assertion of the government contractor defense.

29.      At the removal stage, a defendant need only show that its government contractor defense is colorable, *Sawyer*, 860 F.3d at 254; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'"  *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted).  "A defendant 'need not win his case before he can have it removed.'"  *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense").  At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[10]

---

[10] *See also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the

4891-5951-7466 v.1 058487/00001, 8:59 AM, 04/06/2022

Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

30.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

31.     The Removing Defendants have satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.   The Removing Defendants' products appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, at 5 (finding defendant demonstrated a colorable defense "where it contends that

_____

source of the defense' at this stage.  Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)).

its AFFF products were manufactured according to the U.S. military's MilSpec specifications");

MDL Order 2, at 4 (same, as to Tyco and Chemguard); MDL Order 3, at 5 (same); *see also*

*Chemguard*, 2021 WL 744683, at *4.

32. Moreover, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[11] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[12] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent." In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer. More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA.

---

[11] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1–6 (Nov. 4, 2002) (excerpt).

[12] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

14

Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[13] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and it recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[14] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

33.      At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)).  Where, as here, the government has exercised "discretionary authority over areas of

---

[13] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[14] MIL-PRF-24385F(3) § 6.6 & Tables 1, 3 (2019), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

4891-5951-7466 v.1 058487/00001, 8:59 AM, 04/06/2022

significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

34. The Removing Defendants' use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on these Removing Defendants for alleged injuries to Plaintiffs that were caused in whole or in part by their compliance with military specifications, Plaintiffs are attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

\* \* \*

WHEREFORE, Tyco, Chemguard, and 3M hereby remove this action from the Superior Court of the Commonwealth of Massachusetts, Suffolk County, to the United States District Court for the District of Massachusetts.

*[Signatures on Following Page]*

16

Respectfully Submitted,
Tyco Fire Products LP and Chemguard, Inc.
By their attorney,

*/s Jessica C. Jeffrey*
Jessica C. Jeffrey (BBO #687683)
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
(f) (617) 217-4710

3M Company
By its attorneys,


*/s Jacob J. Lantry*
Jacob J. Lantry (BBO #690452)
Campbell Conroy & O'Neil, P.C.
20 City Square, Suite 300
Boston, MA 02129
jlantry@campbell-trial-lawyers.com
(t) (617)-241-3000
(f) (617) 241-5115

Dated:  April 6, 2022

## CERTIFICATE OF SERVICE

I, Jessica Jeffrey, hereby certify that this document filed through the ECF system will be sent electronically all registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this date including plaintiffs.


Dated: April 6, 2022                                    */s/ Jessica C. Jeffrey*

17

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

DEPARTMENT OF THE TRIAL COURT
DOCKET NO.   2284CV00353

KENNETH GIBSON and AMANDA GIBSON
Plaintiffs,

vs.

3M COMPANY;  AGC CHEMICALS
AMERICAS, INC.; AMEREX CORPORATION;
ARCHROMA U.S., INC., ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT; CARRIER
GLOBAL CORPORATION; CHEMGUARD,
INC.;  DYNAX CORPORATION; E. I. DU PONT
DE NEMOURS & CO.; FIRE-DEX, LLC;FIRE
SERVICE PLUS, INC.;  GLOBE
MANUFACTURING COMPANY LLC;
HONEYWELL SAFETY PRODUCTS USA,
INC.; JOHNSON CONTROLS, INC.;  LION
GROUP, INC.; MINE SAFETY APPLIANCE
COMPANY LLC; NATIONAL FOAM, INC.; PBI
PERFORMANCE PRODUCTS, INC.,
PERIMETER SOLUTIONS, LP; STEDFAST
USA, INC.;  TEN CATE PROTECTIVE
FABRICS USA D/B/A SOUTHERN MILLS
INC.; THE CHEMOURS COMPANY L.L.C.;
TYCO FIRE PRODUCTS, L.P.;  W. L. GORE &
ASSOCIATES, INC. and NORTHEAST RESCUE
SYSTEMS, INC.

Defendants.

2/15/2022

COMPLAINT AND DEMAND FOR
JURY TRIAL.

Plaintiffs KENNETH and AMANDA GIBSON, by and through their attorneys of record,

allege as follows:

**INTRODUCTION**

1.      Plaintiff was a firefighter who have served the cities of West Roxbury and

Boston, Massachusetts as a firefighter for over thirteen years.

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss**          **DEPARTMENT OF THE TRIAL COURT**
                                         **DOCKET NO.**

| | |
|---|---|
| KENNETH GIBSON and AMANDA GIBSON<br>Plaintiffs,<br><br>        vs.<br><br>3M COMPANY;  AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC., ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT; CARRIER GLOBAL CORPORATION; CHEMGUARD, INC.;  DYNAX CORPORATION; E. I. DU PONT DE NEMOURS & CO.; FIRE-DEX, LLC;FIRE SERVICE PLUS, INC.;  GLOBE MANUFACTURING COMPANY LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.;  LION GROUP, INC.; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC., PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.;  TEN CATE PROTECTIVE FABRICS USA D/B/A SOUTHERN MILLS INC.; THE CHEMOURS COMPANY L.L.C.; TYCO FIRE PRODUCTS, L.P.;  W. L. GORE & ASSOCIATES, INC. and NORTHEAST RESCUE SYSTEMS, INC.<br><br>        Defendants. | **2/15/2022**<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs KENNETH and AMANDA GIBSON, by and through their attorneys of record, allege as follows:

## **INTRODUCTION**

1.      Plaintiff was a firefighter who have served the cities of West Roxbury and Boston, Massachusetts as a firefighter for over thirteen years.

2.      Plaintiffs bring this action for monetary damages for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries

3.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, inter alia, resist and repel oil, stains, heat and water. PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

4.      PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.[1]

5.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.  PFAS have also been found to concentrate in human blood, bones and organs and, most recently, to reduce the effectiveness of vaccines, a significant concern in light of COVID-19.

6.      Unbeknownst to Plaintiffs, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed

---

[1] Suzanne E. Fenton, MS, PhD, *PFAS Collection, Environmental Health Perspectives* (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

2

for firefighters ("turnouts") and in Class B firefighting foams ("Class B foam").[2]

7.      For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock,[3] as well PFAS-containing turnouts and Class B foam, to firefighting training facilities and fire departments nationally, including in Massachusetts and in the West Roxbury and Boston fire departments. Defendants did so, moreover, without ever informing firefighters or the public that turnouts and Class B foams contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

8.      The Firefighter Plaintiff wore turnouts and used Class B foam in the usual and normal course of performing his firefighting duties and training and were repeatedly exposed to PFAS in their workplace. They did not know and, in the exercise of reasonable diligence, could not have known that these products contained PFAS or PFAS-containing materials. They also did not know that PFAS was in their bodies and blood.

9.      At all relevant times and continuing to the present, Defendants have represented that their turnouts and Class B foams are safe.

10.     The Firefighter Plaintiff used the turnouts and Class B foam as they were intended and in a foreseeable manner which exposed them to PFAS during firefighting activities. This

---

[2] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").

[3] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction. The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

3

repeated and extensive exposure to PFAS resulted in cancers and other serious and life-threatening diseases to the Firefighter Plaintiff. Their PFAS exposures continue to pose a significant threat to their personal health due to PFAS' persistence, pervasiveness, toxicity and bioaccumulation.

11.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Massachusetts when they knew or reasonably should have known that the Firefighter Plaintiff would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

12.     Plaintiffs bring this action against Defendants and seek damages, together with any appropriate injunctive or other equitable relief.

## PARTIES TO THE ACTION

### Plaintiffs

13.     Kenneth Gibson was a firefighter for over 13 years for the West Roxbury and Boston Fire Departments. His firefighter training included building construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and overhaul, vehicle extrication, incident command, and basic first aid.  In the course of firefighting training and fire suppression activities, Kenneth routinely wore turnouts and has used and/or been exposed to Class B foam.  He was unaware that the turnouts he wore, and the Class B foam used contained PFAS or PFAS-containing materials. Kenneth was diagnosed with prostate cancer in October 2020. He was only 45 years old.

4

14. Amanda Gibson is the spouse of Firefighter Plaintiff Kenneth Gibson. Amanda and Kenneth were lawfully married at all times relevant to this action and are currently husband and wife. They reside in Taunton, Massachusetts.

**Defendants**

15. Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

16. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

17. Defendant Amerex Corporation, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation that does business throughout the United States, including conducting business in Massachusetts. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

18. Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Massachusetts. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed,

manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

19.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Massachusetts. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

20.     Defendant Buckeye Fire Equipment ("Buckeye") is a North Carolina corporation that does business throughout the United States, including conducting business in Massachusetts. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

21.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Carrier has its principal place of business in Palm Beach Gardens, Florida. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

22.     Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation that does business throughout the United States, including conducting business in Massachusetts. Chemguard has its principal place of business in Marinette, Wisconsin. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

6

23.     Defendant Dynax Corporation ("Dynax") is a New York corporation that does business throughout the United States, including conducting business in Massachusetts. Dynax has its principal place of business in Pound Ridge, New York. Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

24.     Defendant E. I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

25.     Defendant Fire-Dex, LLC ("Fire-Dex") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Fire-Dex has its principal place of business in Medina, Ohio. Fire-Dex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

26.     Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the United States, including conducting business in Massachusetts. Fire Service Plus has its principal place of business in Simi Valley, California. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

27.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in

7

Massachusetts. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

28.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

29.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Johnson Controls has its principal place of business in Milwaukee, Wisconsin. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

30.     Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in Massachusetts. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed,

distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

31.     Defendant Mine Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Massachusetts. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

32.     Defendant National Foam, Inc., ("National Foam") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Massachusetts. National Foam has its principal place of business in West Chester, Pennsylvania. National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

33.     Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. PBI has its principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

34.     Defendant Perimeter Solutions, LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Perimeter Solutions has a principal place of business in Rancho Cucamonga,

California. Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

35.    Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

36.    Defendant Ten Cate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Massachusetts. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

37.    Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

38.    Defendant Tyco Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Tyco has its principal place of business in Exeter, New Hampshire. Tyco developed, manufactured,

10

marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

39.     Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Massachusetts. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Massachusetts.

40.     Defendant Northeast Rescue Systems, Inc. ("Northeast") is a Massachusetts corporation with its principal place of business at 291 Farm Lane, Westwood, Massachusetts. Northeast distributes and sells PFAS materials, and products containing PFAS in turnouts and/or Class B foams in Massachusetts.

41.     Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to Plaintiffs, as alleged herein.

42.     Plaintiffs allege that each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled and/or sold within Massachusetts, and that were used by Firefighter Plaintiffs herein within Massachusetts.

43.     Defendants expected or should have expected their acts to have consequences within the Commonwealth of Massachusetts and derived substantial revenue from interstate commerce.

44.     Defendants purposefully availed themselves of the privilege of conducting activities within the Commonwealth of Massachusetts, thus invoking the benefits and protections of its laws.

## JURISDICTION AND VENUE

45.     This Court has jurisdiction over this action pursuant to G.L. ch. 212, §4. This Court has personal jurisdiction over the Defendants pursuant to G.L.Ch. 223A, §§2 and 3.

46.     Venue is proper in this Court because the Firefighter Plaintiff's exposure and injuries, resulting from the acts of Defendants alleged herein, occurred in Suffolk County within the Commonwealth of Massachusetts.

## SUBSTANTIVE ALLEGATIONS

47.     The Firefighters Plaintiff's Use of and Exposure to PFAS-Containing Products

48.     The Firefighter Plaintiff served the city Boston as a firefighter and worked in West Roxbury (Engine 55) and Boston (Engine 22) for over thirteen years.

49.     As first responders to fire, medical and other emergency calls, the Firefighter Plaintiff risked his life daily. He not only saves lives and homes, he provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare them for this enormously challenging work, the Firefighter Plaintiff wore turnouts/bunker gear and received extensive and ongoing training in fire suppression (including the preparation, handling and use of firefighting foam), fire prevention, rescue, and emergency medical care techniques to protect and/or minimize the loss of life, property, and damage to the environment.

50.     The Boston Fire Department is the largest municipal fire department in New England, serving 685,000 people.

12

51.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or turnouts and/or Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the Commonwealth of Massachusetts and the cities of West Roxbury and Boston and their communities in Massachusetts.

52.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, inter alia, resist and repel oil, heat and water, and have been found to have negative health effects.  As detailed below, these toxic chemicals are present in firefighter turnouts and Class B foam.

### PFAS-Containing Turnout Gear

53.     During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves. Each component of the jacket and pants are made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.[4]

54.     PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

---

[4] *What Materials Go Into Making Turnout Gear?*, Globe MSA Safety Website, (last visited September 29, 2021), https://globe.msasafety.com/selecting-your-gear/materials.

13

55.     A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including the Firefighter Plaintiffs.[5]  When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust,[6] exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.[7] Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles and homes.[8].

56.     Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was

---

[5] Graham Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23, 2020) (hereinafter, "the Notre Dame Turnout Study").

[6] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.

[7] *Id.*

[8] *Id.*

14

"slightly to moderately toxic" and inhalation was "highly toxic."[9] The memo concluded "continued exposure is not tolerable."[10]

57.     As alleged herein, the Firefighter Plaintiffs wear and/or wore turnouts in the ordinary course of performing their duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed them to significant levels of PFAS.

58.     The Firefighter Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts he wore or used in performing his duties.  The turnout gear worn or used by the Firefighter Plaintiff did not and does not contain labeling information saying that the gear contains PFAS, and similarly did not and does not warn the Firefighter Plaintiff of the health risks associated with exposure to PFAS.

59.     Like fire departments across the country, firefighters only had one set of turnouts for years, and would wash their turnouts at home and/or in station machines along with their daily station wear uniforms.

### PFAS-Containing Class B Foam

60.     Class B foam is one of the primary tools used by firefighters for suppression of fires and is particularly effective for extinguishing fires involving oil and/or chemicals common at transportation accidents, aircraft accidents, and chemical spills.  Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to

---

[9] Robert Bilott, *Exposure* (2019), pg. 174.

[10] *Id.*, at pg. 175.

ensure that unseen fire is extinguished. The most common Class B foam is aqueous film-forming foam ("AFFF"). AFFF and other Class B foams contain PFAS.

61.     To use Class B foam, a Class B foam concentrate must first be mixed with water.

62.     Class B foam concentrate is typically sold in five-gallon containers that firefighters are responsible for storing on the fire engine and/or pouring into the foam bladder of fire engine. To mix the foam concentrate and water from a fire engine that is not pre-plumbed for foam, an educator must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, foamy substance. Firefighters are responsible for this process of preparing the foam, applying the foam and for cleaning the equipment (hoses, nozzles, etc.) after use.

63.     The process of preparing and applying Class B foam, applying the foam, and then cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by the Firefighter Plaintiffs and their fire departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS and did not warn the Firefighter Plaintiff of the serious health risks associated with exposure to PFAS.

64.     Class B foam is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose, appliance or nozzle.

65.    The techniques used for "laying a blanket" of Class B foam in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.



66.    These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use – all as depicted in the exemplar photographs below. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

67.    As alleged herein, the Firefighter Plaintiff used and/or was exposed to Class B foam in the ordinary course of performing his duties as it was intended to be used and in a foreseeable manner which exposed him to significant levels of PFAS.

68.     The Firefighter Plaintiff did not know, and in the exercise of reasonable diligence, could not have known that the Class B foam he used and/or was exposed to in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam he used and/or was exposed to in performing his duties.



69.     These exposures to PFAS or PFAS-containing materials resulted in serious and life-threatening diseases to the Firefighter Plaintiff and continue to pose a significant health threat to him given the bioaccumulation, pervasiveness and persistence of PFAS.



70.    The Chemical Structure of PFAS Makes Them Harmful to Human Health.

71.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.[11] Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.[12] Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.[13]

---

[11] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited September 30, 2021), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

[12] *Id.*

[13] *Id.* at fn. 7; Monica Amarelo, Study: *Almost All Fluorine Detected in Fire Stations' Dust Is From Unknown "Forever Chemicals,"* Environmental Working Group (February 5, 2021), https://www.ewg.org/release/study-almost-all-fire-stations-dust-unknown-forever-chemicals.

72.    PFAS are nearly indestructible and are highly transportable.[14]  PFAS exposure to

humans can occur through inhalation, ingestion, or dermal contact.[15]

73.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA

that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS,

PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS

are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are

molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020 shows

that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost

impossible to remove from water, bio-accumulate in humans and the environment, and show

similar toxicity as long-chain PFAS.[16]  Short-chain PFAS also have lower technical performance

and may therefore be used at higher quantities cancelling out any supposed benefits of lower

bioaccumulation potential.[17]

74.    In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its

---

[14] *Toxicological Profile for Perfluoroalkyls*, see Relevance to Public Health, Agency for Toxic Substances & Disease Registry, (last visited October 19, 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

[15] *Id.* at pgs. 3-4; Ketura Persellin, *Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion*, Environmental Working Group (January 13, 2020).

[16] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity*, US National Toxicology Program says, Chemical and Engineering News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; David Andrews, *FDA Studies: 'Short-Chain' PFAS Chemicals More Toxic Than Previously Thought*, Environmental Working Group (March 9, 2020), https://tinyurl.com/y3lbq7by; Stephan Brendel et al., *Short-chain Perfluoroalkyl Acids: Environmental Concerns and A Regulatory Strategy Under REACH*, Environmental Sciences Europe, Vol. 30, 1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/; Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS*, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

[17] Martin Scheringer et al., *Helsingor Statement on Poly- and Perfluorinated Alkyl Substances (PFASs)*, Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400678X.

2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant Chemours GenX chemicals are more toxic than PFOA - the highly toxic chemical these were intended to replace.[18]

74. 75.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body.  Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health.  Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.[19]

76.    PFAS exposure affects nearly every system in the human body.[20]  It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.[21]  It has also been found to concentrate in

---

[18] Cheryl Hogue, *US EPA Deems Two GenX PFAS Chemicals More Toxic than PFOA*, Chemical & Engineering News (October 28, 2021), https://cen.acs.org/environment/persistent-pollutants/US-EPA-deems-two-GenX-PFAS-chemicals-more-toxic-than-PFOA/99/i40.

[19] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), United States Environmental Protection Agency, (Nov. 2017), https://www.epa.gov/sites/production/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

[20] Kelly Lenox, PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony, Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas/index.htm.

[21] A. Koskela et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation*, Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/pdf/41598_2017_Article_7359.pdf; *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of Perfluorooctanoic Acid Administered in Feed to Sprague Dawley* (Hsd: Sprague Dawley SD) Rats,

human blood, bones and organs, and to reduce the effectiveness of certain vaccines, a significant concern in light of COVID-19.[22]

77. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS.

78. Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS-containing turnout gear and Class B foam, throughout the United States and in Massachusetts.

79. PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

80. By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

81. In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

82. In the 1970s, Defendants National Foam and Tyco began to manufacture, market and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

---

National Toxicology Program, (May 2020), https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf; Jaclyn Goodrich et al., *Per- and Polyfluoroalkyl Substances, Epigenetic Age and DNA Methylation: A Cross-Sectional Study of Firefighters*, Epigenomics (October 2021), https://pubmed.ncbi.nlm.nih.gov/34670402/.

[22] *Id.* (Koskela study); Tasha Stolber, *PFAS Chemicals Harm the Immune System, Decrease Response to Vaccines, New EWG Review Finds*, Environmental Working Group (November 12, 2020), https://www.ewg.org/news-and-analysis/2020/11/pfas-chemicals-harm-immune-system-decrease-response-vaccines-new-ewg.

83.     Founded in 1918, Defendant MSA/Globe began manufacturing, marketing, and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[23]

84.     Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.[24]

85.     Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI, and StedFast.

**Defendants Know Exposure to PFAS Causes Serious Health Impacts**

86.     Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally yet were never made public or shared with any regulatory agencies.  Among the

---

[23] *See Globe History*, Globe MSA Safety Website, (last visited February 26, 2021), https://globe.msasafety.com/history; *Turnout Gear Materials*, Globe MSA Safety Website, (last visited February 26, 2021), https://globe.msasafety.com/materials.

[24] *See Our History*, Lion Website (last visited September 29, 2021), http://www.lionprotects.com/lion-history; Firefighter Turnouts, Lion Website (last visited September 29, , 2021), https://www.lionprotects.com/firefighter-turnout-gear.

findings:

    a.  A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.[25]

    b.  In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers.[26] A year later, these results were replicated in studies with dogs.[27]

    c.  In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."[28]

    d.  In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.[29]

    e.  In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.[30]

    f.  By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.[31]

    g.  In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female

---

[25] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public*, Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf; see also, https://www.ewg.org/pfastimeline/.

[26] *Id.*

[27] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, New York Times (June 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[28] *Id.*, at fn. 25.

[29] *Id.*

[30] *Id.*

[31] PFCS: *Global Contaminants: PFCs Last Forever*, Environmental Working Group, (April 3, 2003), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.

employees but did not inform the EPA or make this information public.[32]

h.  In 1988, a company that purchased PFAS firefighting foam complained to 3M because
the product was not biodegradable as 3M represented.[33]  Subsequently, a 3M employee
wrote an internal memo that "3M should stop perpetrating the myth that these
fluorochemical surfactants are biodegradable, but the company continued to sell them."[34]

i.  By at least the end of the 1980s, research performed by Defendants, including
specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials
indicated that at least one such PFAS material, PFOA, caused testicular tumors in a
chronic cancer study in rats, resulting in at least Defendant DuPont classifying such
PFAS material internally as a confirmed animal carcinogen and possible human
carcinogen.[35]

j.  In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic
and liver tumors in lab animals. One study also suggested that PFOA exposure could
cause possible DNA damage.[36]  Another study of workers found a link between PFOA
exposure and prostate cancer.[37]

k.  In response to the alarming and detrimental health impact, DuPont began to develop an
alternative to PFOA and in 1993, an internal memo announced that "for the first time, we
have a viable candidate" that appeared to be less toxic and showed less
bioaccumulation.[38]  DuPont decided against using this potentially safer alternative,
however, because products manufactured with PFOA were worth $1 billion in annual
profit.[39]

l.  On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA".  3M
informed DuPont that the half-life of PFOA was much longer than animal studies

_____

[32] *Id.*, at fn. 25.

[33] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II*,
Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and
Reform, House of Representatives (September 19, 2019),
https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-
20190910.pdf.

[34] *Id.*

[35] *Id.*, at fn. 25.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

showed.[40]

87.     Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.[41] These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.[42]

88.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the EPA information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiffs, or the public about the health impacts resulting from exposure to PFAS.[43] Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.[44]

89.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and

---

[40] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[41] *Id.*, at fn. 25.

[42] *Id.*

[43] *Id.*

[44] *Id.*, at fn. 33.

animal tissues and could potentially pose a risk to human health and the environment over the long term."[45]

90.     However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country.  And no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts, and Class B foams and did so without any warning to firefighters or to the public concerning the fact that these turnouts and foams contained PFAS, or that they posed a serious health risk to human health.  Defendants instead continued to claim their products were safe.

91.     By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.[46]

92.     In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

93.     Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts and Class B foam, and continued to publicly

---

[45] EPA and 3M Announce Phase Out of PFOS, Press Release, United States Environmental Protection Agency (May 16, 2000),
https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.

[46] *Id.*, at fn. 25.

claim that these products were safe. Defendants affirmatively suppressed independent research

on PFAS, and instead commissioned research and white papers to support their claims that PFAS

and PFAS-containing products were safe to use, engaging consultants to further this strategy and

ensure that they would continue to profit from these toxic chemicals and products.

94.    As one consultant wrote in pitching its services to DuPont, it was critical that the

PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the

plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the

effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was

further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . . .The outcome of
> this process will result in the preparation of a multifaceted plan to take control of
> the ongoing risk assessment by the EPA, looming regulatory challenges, likely
> litigation, and almost certain medical monitoring hurdles. The primary focus of
> this endeavor is to strive to create the climate and conditions that will obviate, or
> at the very least, minimize ongoing litigation and contemplated regulation relating
> to PFOA. This would include facilitating the publication of papers and articles
> dispelling the alleged nexus between PFOA and teratogenicity as well as other
> claimed harm. We would also lay the foundation for creating Daubert precedent
> to discourage additional lawsuits.[47]

95.    Class B foam manufacturers and distributors adopted a similarly aggressive

industry campaign to evade government oversight or public attention of the risks posed by their

products. At a March 2001 meeting of the National Fire Protection Association's Technical

Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard and

National Foam, a 3M representative informed attendees that 3M had discontinued its Class B

foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of

---

[47] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special
Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

PFOS.48 Attendees also were informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

96.     On or about the same time, certain Defendants, including at least Tyco, DuPont, Dynax and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors and suppliers of Class B foam (specifically AFFF).  The FFFC's self-described role was to be "the environmental voice for users and manufacturers of AFFF"[49] – one designed to ignore the health impacts of exposure to PFAS-containing Class B foams such as AFFF:

> Not too long ago, 3M had environmental concerns about a chemical in their product and decided to withdraw from the AFFF market. Even though no other manufacturers used the questionable chemical, the withdrawal of 3M from AFFF production raised a red flag. As a direct result, a lot of half-truths and misinformation published by some well-meaning, but misinformed, groups began to surface. One organization went so far as to label our products as "hazardous waste" and as posing an "occupational health or environmental hazard." At the same time, the Federal government was focusing its attention on the industry and needed to identify an industry representative that could provide fact-based information and serve as a focal point for dialogue. We decided, therefore, to form the FFFC in order to educate, inform and help persuade regulatory and legislative decision-makers that firefighting foams are a value-added component to any firefighting capability.[50]

---

[48] NFPA-11 Technical Committee Meeting Notes (National Fire Protection Association for Standards on Low-, Medium- and High-Expansion Foam) (March 14-15, 2001), https://assets.documentcloud.org/documents/4178280/NFPA-Schedule.pdf.

[49] Fire Fighting Foam Council Website (last visited September 29, 2021), https://www.fffc.org/afff-update.

[50] *Id.* at https://web.archive.org/web/20020811142253/http:/www.fffc.org/about.html (captured August 11, 2002).

97.     Defendants also pivoted with a new industry strategy. Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

98.     In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company).[51]  In the face of and undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, distribute and/or sell turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[52]

99.     In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, and Arkema to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[53]

100.     By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human

---

[51] Michael Janofsky, *DuPont to Pay $16.5 Million for Unreported Risks*, New York Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-millionLion-for-unreported-risks.html.

[52] *DuPont and Lion Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and Lion (January 30, 2013), https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; Our Partners, Globe Website (last visited February 26, 2021), https://globe.msasafety.com/our-partners; and Firefighter & Emergency Response Protection, DuPont Website (last visited February 26, 2021), https://www.dupont.com/personal-protection/firefighter-protection.html.

[53] *PFOA Stewardship Program*, United States Environmental Protection Agency (last visited September 29, 2021), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.[54]

101. In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described in paragraph 117, above, began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

102. In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[55]

103. In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect

---

[54] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

[55] *Id.*, at fn. 16, see Tom Neltner, http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

itself from environmental cleanup and related responsibilities."[56]

104.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[57]

105.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS.[58]  Roberts remarked that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity - as testified to by one of DuPont's former scientists only a few days earlier.[59]  Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.[60]

**Defendants Failed to Warn Plaintiffs of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe**

---

[56] *Id.*, at fn. 33.

[57] A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases, Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-military-fact-sheet-ucs-2018.pdf.

[58] *Id.*, at fn. 33.

[59] *Id.*

[60] *Id.*

106.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

107.    Yet, Defendants did not warn Plaintiffs that PFAS and Defendants' PFAS-containing products, including turnouts and Class B foams used by the Firefighter Plaintiff, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

108.    Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing products, including turnouts and Class B foams, are safe and not harmful to humans or the environment.

109.    Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In 2020, for example, Congress passed legislation to address PFAS in turnouts and foam,[61] and numerous states have severely restricted and/or banned PFAS-containing firefighting foam. For example, California will also require sellers of turnout gear to notify purchasers if it contains PFAS while Colorado has banned PFAS-containing turnouts as of 2022.[62] The U.S. Food and Drug Administration

---

[61] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters, Fire Rescue 1*, (December 17, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/.

[62] Andrew Wallender, *Toxic Firefighting Foam With PFAS Scrutinized by Multiple States*, Bloomberg Law (June 18, 2020), https://news.bloomberglaw.com/pfas-project/toxic-firefighting-foam-with-pfas-scrutinized-by-multiple-states; Cheryl Hogue, California Bans PFAS Firefighting Foams, Chemical & Engineering News (October 1, 2020), https://cen.acs.org/environment/persistent-pollutants/California-bans-PFAS-firefighting-foams/98/i38#:~:text=California%20is%20halting%20the%20sale,US%20market%20to%20do%20so; Marianne Goodland, While Dozens of Bills Are Getting Axed, A Bill on Firefighting Chemicals Sails On, Colorado Politics (May 28, 2020), https://www.coloradopolitics.com/legislature/while-dozens-of-bills-are-getting-axed-a-bill-on-firefighting-chemicals-sails-on/article_1b1e05f2-a11e-11ea-a270-230a36e06594.html; Legislature Takes Strongest Stand Yet to Phase out PFAS in Firefighting Foam,

33

similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).[63] And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g. Columbia and Marmot), clothing retailers (e.g. H&M, Levi Strauss & Co), shoe companies (e.g. Adidas and New Balance), car seat manufacturers (e.g. Britax and Graco), furniture companies (e.g. IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.[64]

### Defendants Provide No Safety Warnings on Product Labels

110.     Plaintiffs allege that the packaging on the PFAS-containing Class B foam containers used for mixing Class B foam with water, pumping the mixture into engines, and for spraying and laying foam blankets for fire suppression or fire suppression training, contained no warning that the Class B foam contained PFAS. Nor did it inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm.

111.     Below are photos typical of the Class B foam containers manufactured, marketed, distributed, or sold by Defendants in Massachusetts that Firefighter Plaintiffs used in training or in fire suppression during their firefighting careers. The labels on the containers warn only of

---

Washington State Council of Fire Fighters (March 5, 2020), https://www.wscff.org/legislature-takes-strongest-stand-yet-to-phase-out-pfas-in-firefighting-foam/;

[63] *FDA Announces the Voluntary Phase-Out by Industry of Certain PFAS Used in Food Packaging,* U.S. Food and Drug Administration, July 31, 2020, https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-voluntary-phase-out-industry-certain-pfas-used-food-packaging.

[64] Muhannad Malas, *Home Depot, Lowe's and Staples Take Action to Protect Their Customers from PFAS and Other Harmful Toxics Lurking in Carpets and Office Supplies,* Environmental Defense (November 5, 2019), https://environmentaldefence.ca/2019/11/05/home-depot-lowes-staples-protect-customers-toxics/; PFAS-Free Products, PFAS Central, (last visited February 15, 2021), https://pfascentral.org/pfas-free-products/.

possible skin or eye irritation and suggest rinsing areas of contact with water. They contain no

information about the Class B foam containing PFAS or PFAS-containing materials and provide

no warning whatsoever of the human health risks and serious health conditions associated with

PFAS exposure resulting from the normal and intended use of Class B foam in fire suppression

or fire suppression training.

 

112.     Plaintiffs further allege that turnouts containing PFAS or PFAS materials sold by

Defendants in Massachusetts, and used by the Firefighter Plaintiff in training, emergency

incidents, or in fire suppression during his firefighting career, also contained no warning that the

turnouts contain PFAS or PFAS materials.  Nor did these labels inform persons handling,

wearing, or using the turnouts as they were intended to be handled, worn, or used can result in

exposure to PFAS and serious bodily harm.

113.    Below are photos typical of warning labels for turnouts manufactured, marked,

sold, and distributed by Defendants MSA/Globe and Lion.  As depicted below, the labels do not

disclose that the turnouts contain toxic PFAS or PFAS materials, and contain no warning that

handling, wearing, or using the turnouts as they were intended to be handled, worn or used can

result in exposure to PFAS and serious bodily harm.  Further, while the labels provide washing

instructions, the instructions do not advise that turnouts should be washed in a commercial

extractor to prevent cross-contamination and PFAS-exposure to family members who handle or



wash the turnouts with other garments in home washing machines.





**Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure**

114.    A Material Safety Data Sheet (or "MSDS") is a document that Occupational Safety and Health Administration (OSHA) requires companies to provide to end users for products that contain substances or chemicals that are classified as hazardous or dangerous. Access to such information is necessary for the Firefighter Plaintiffs to provide a safe and effective response in emergency situations.

115.    The MSDS provided with Defendants' Class B foams did not – and to this day do not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent, toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm.  To the contrary, the MSDS falsely stated that the Class B foams and/or their contents were not known carcinogens and did not cause birth defects.

116.    Even now, the MSDS do not reflect the known serious health risks and hazards associated with exposure to PFAS in these Class B foams. For example, a MSDS updated on as recently as May 19, 2021by Defendant National Foam for AFFF stated the product was not considered carcinogenic - contrary to decades of science.[65]

**Defendants' Misrepresentations About PFAS Continue to this Day**

117.    Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts and Class B foams made with or containing PFAS.

---

[65] National Foam Safety Data Sheet for Centurion (TMC6) 6% Aqueous Film Forming Foam Concentrate (AFFF) (May 19, 2021) https://nationalfoam.com/wp-content/uploads/sites/4/NMS340_Centurion-6-AFFF-Concentrate_052192021.pdf.

118. Defendants' misinformation campaign is long-standing and continues to this day.
Some pertinent examples include:

a. 2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the
Columbus Dispatch, expressing outrage at the assertion in a government filing that
firefighters may have been exposed to PFAS through turnout gear. Schwartz called this
assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or
PFOA: "PFOAs and PFOSs have never been components of Lion's turn-out gear, either
as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to
provide a durable water repellant, and that the textile industry in the past had used PFOA
as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is
possible that trace amounts may have been present as a residue when the films and
finishes were incorporated into Lion's turn-out gear. However, based on all available
scientific data, such nominal trace amounts, if they existed at all, would not have posed
any health risk to firefighters. There is absolutely no connection at all between PFOS and
firefighter turnout gear."[66]

b. 2018 – The National Fire Protection Association (which maintains committees on foams
and turnouts that are comprised, in part, of certain Defendants) issued a publication
listing 11 ways to minimize risk of occupational cancer – the suggestions centered on
wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts
after exposure to chemicals. There was not a single mention of avoiding contact with
foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing
materials.[67]

c. 2019 – Defendant Lion issued a Customer Safety Alert for PFOA and Turnout Gear
stating: "Your Lion turnout gear continues to be safe and ready for action especially
when properly maintained. It is extremely important that firefighters continue to wear and
properly care for their gear to stay safe on the job."

d. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that
she absolutely agreed with the statement that "the weight of current scientific evidence

---

[66] Letter from Lion president Stephen A. Schwartz to Ala D. Miller, Editor, The Columbus Dispatch
(October 30, 2017), http://files.constantcontact.com/bf8abd7a001/01f5d727-d72e-42dc-971b-
caa9c2855800.pdf.

[67] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and
NVFC*, National Fire Protection Association Xchange (August 16, 2018),
https://community.nfpa.org/community/nfpa-today/blog/2018/08/16/11-best-practices-for-preventing-
firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc.

does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."[68]

e.  2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."[69]

f.  2019 – Defendant Dynax founder Eduard Kleiner stated that C6-based surfactants [short-chain PFAS] do not bioaccumulate.[70]

g.  2019 – Defendant Gore issued a public statement stating that "the potential exposures and associated risks of cancer effects from PFOA alternative an non-polymeric perfluoralkyl substances in Gore Components [turnout gear] are insignificant."[71]

h.  2020 - FluoroCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.[72]

i.  2020 – The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and not considered to be bio-accumulative based on current regulatory criteria."[73]

---

[68] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing*, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.

[69] *AFFF Update Newsletter*, Fire Fighting Foam Council (April 2019), https://tinyurl.com/y57c5jwx.

[70] Marc S. Reisch, *What Is the Price of Fire Safety?*, Chemical & Engineering News (January 14, 2019), https://cen.acs.org/business/specialty-chemicals/price-fire-safety/97/i2?ref=search_results.

[71] W.L. Gore and Associates, *Exposure Assessment and Cancer Risk Characterizations for Firefighters from Non-Polymeric PFAS Residuals in Gore Components Used in Firefighting Gear*, (August 20, 2019), https://www.gortexprofessional.com/sites/tof/files/pdfs/Firefighter%20Exposure%20Assessment%20Short%20Chain%20Non%20Polymer%20Residual.pdf

[72] *An Important Update About FluoroCouncil*, FluoroCouncil, Global Industry Council for Fluoro Technology (https://portal.ct.gov/DEEP/Remediation--Site-Clean-Up/PFAS-Task-Force/Pollution-Prevention-Committee - see "Resources" -- Fluorocouncil PFAS Information (August 23, 2019).

[73] *Fact Sheet on AFFF Fire Fighting Agents*, Fire Fighting Foam Council (2017), https://tinyurl.com/yyxscyas.

j.  2020 – The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B
Foam - which was published in May 2016 and has not been updated to reflect the latest
research - focuses entirely on eliminating and containing foam to minimize impact on the
environment. It makes no mention of how to minimize the impact on firefighters who
routinely handle, prepare, spray, or use Class B foam during training or in firefighting.[74]

k.  2020 – Defendant Lion-hired consultant Paul Chrostowski, PhD took out a full-page in
Firefighter Nation to argue that turnout gear is completely safe and any evidence to the
contrary, including the Notre Dame study, is unreliable and fear-mongering. "[E]ven if
PFAS were found in their turnout gear, at this time there is no credible evidence that it
ends up in firefighters bodies in amounts that would be higher than the general
population…. the connection between PFAS and cancer is extremely weak. The few
peer-reviewed epidemiological studies that have found an association were not
statistically significant and inconsistent with other studies…. The materials used in
turnout gear are the safest materials available, and without them, firefighters would be at
extreme risk for burns and exposure to known cancer-causing toxic chemicals present on
the fireground, as well as metabolic heat stress….Alternative materials tried by the U.S.
fire service thus far have proven to be unsafe."[75]

l.  2020 – Defendant Lion through its hired consultant Chrostowski also stated in Firefighter
Nation that all turnouts are compliant with the standards set by the NFPA and Swiss
organization OEKO-TEX's  Standard 100 for PPE and Materials for PPE. "The OEKO-
TEX certification process tests for the presence of unsafe levels of trace materials,
including PFOA."[76]

m.  2021 - In a New York Times article, Defendant W.L. Gore maintained that its turnout
products were safe.[77]

---

[74] *Best Practice Guidance for Use of Class B Firefighting Foams*, Fire Fighting Foam Council (May
2016), https://tinyurl.com/2kzdsed9.

[75] Paul Chrostowski, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe
Despite Claims* (June 3, 2020), https://www.firefighternation.com/health-safety/research-and-
independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/#gref.

[76] *Id.*

[77] Hiroko Tabuchi, *Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic*, New York Times,
(January 26, 2021), https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html.

n.  2021 – In a Boston Globe article, spokeswoman for W.L. Gore would not comment on the Peaslee study by instead noted that turnout gear was "developed to protect firefighters working in harsh and often dangerous conditions."[78]

o.  2021 – Defendant Lion stated that the representations articulated by its consultant Paul Chrostowski in 2020 (see above), reflect its position: "Dr. Chrostowski's report says it all for Lion."[79]

p.  2021 – Defendants MSA Globe and W. L. Gore have continued to state that their products have been tested and are safe.[80]

q.  2022 – Defendant 3M stated that it was not "necessary or appropriate" to declare any PFAS hazardous.[81] It also states on its website that: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels….Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS….It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA causes harm to people at current or historical levels. Although PFAS have been detected in the environment at extremely low levels, their mere presence does not mean they are harmful…. Although it has been widely reported that no causal connection has been identified between exposure to PFOS or PFOA and harm to people's health, there is a great deal of misinformation in the public domain…. The findings of the C-8 science panel are also frequently misunderstood."[82]

r.  2022 - DuPont and Chemours also continue to assert that there is little scientific evidence to support that PFAS and/or certain PFAS, like fluoropolymers, are harmful to human

---

[78] David Abel, *Firefighters may be wearing gear that contains toxic chemicals, researchers find*, Feb. 5, 2021, https://www.bostonglobe.com/2021/02/06/metro/firefighters-may-be-wearing-gear-that-contains-toxic-chemicals-researchers-find/?event=event12

[79] David Ferry, *The Toxic Job of Being A Hero*, Men's Health, (September 21, 2021), https://www.menshealth.com/health/a37624731/cancer-firefighter-gear-pfas/.

[80] Andrew Wallender, *Firefighters Want Halt on Money From Makers of PFAS-Laden Gear*, Bloomberg Law, (January 19, 2021), https://news.bloomberglaw.com/pfas-project/firefighters-want-halt-on-money-from-makers-of-pfas-laden-gear.

[81] Jim Spencer, *3M's Support for PFAS Could Cost Taxpayers Billions of Dollars*, Star Tribune (September 11, 2021), https://www.startribune.com/3m-s-support-for-pfas-could-cost-taxpayers-billion-of-dollars/600096094/.

[82] 3M website, PFAS Stewardship – Health Science (last visited January 12, 2022), https://www.3m.com/3M/en_US/pfas-stewardship-us/health-science/.

42

health.[83]

s.  2022 - DuPont maintains that turnouts keep firefighters safe and "protect against the intrusion of...chemicals."[84]

119.  As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership has echoed these narratives.

120.  For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts and Class B foams was minimal to non-existent.[85] The statement even encouraged firefighters to continue to wear turnouts and use legacy Class B foams, creating a false sense that these PFAS-containing turnouts and foams were safe.  The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US....Fire fighters may have additional PFOA exposure sources such as older Class B firefighting foams. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US

---

[83] DuPont website, Information on PFAS (last visited January 12, 2022), https://www.pp.dupont.com/pfas/what-governmental-agencies-say.html; Chemours website, Our Commitment to PFAS Stewardship (last visited January 12, 2022), https://www.chemours.com/en/corporate-responsibility/sustainability-safety/our-commitment-to-pfas-stewardship.

[84] *Id.* at DuPont website (last visited January 12, 2022), https://www.pp.dupont.com/knowledge/dupont-technology-in-your-turnout-gear.html.

[85] The IAFF maintained this position until January 2021 when IAFF members demanded that the IAFF leadership hold turnout and Class B foam manufacturers accountable.85 In July 2021, new IAFF President Edward Kelley made clear that the cancer rates of firefighters is unacceptable, and that IAFF is actively working to rid the fire service of the toxic PFAS found in firefighting foams and turnout gear. "The data is becoming clearer. The gear that's supposed to be protecting us is poisoning us. It defies logic. IAFF, Address by IAFF General President Edward Kelly, Facebook (July 16, 2021), https://www.facebook.com/IAFFonline/videos/180233720677454.

manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.  IAFF will continue to monitor developments and update this fact sheet should new information become available.[86]

121.    The IAFF maintained the Defendants' position that the turnout gear and Class B foam was safe until new leadership took over in 2021.  Because of these and other false claims and misrepresentations on the part of Defendants, the Firefighter Plaintiff did not know and, in the exercise of reasonable diligence, could not have known that the turnouts and Class B foams he used contained PFAS or PFAS-containing materials, and caused the Firefighter Plaintiff to be exposed to PFAS and/or PFAS-containing materials, causing him to suffer cancers and other serious illnesses as a result of such exposure.

122.    Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

**New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and Class B Foams — But Defendants Continue to Discount or Deny These Risks**

123.    While historical research (and follow-on litigation) has centered on environmental

---

[86] Statement on PFOA and Turnout Gear, International Association of Firefighters, (May 2017), https://tinyurl.com/y29mfh69.

impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts and Class B foams containing PFAS.

124.    In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper that, in the words of its authors, "presents unequivocal evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans." [87] The paper explains that "[f]irefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem."[88] The panel concluded that "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io-accumulation and very slow bio-elimination may be very significant influencing factors in PFHxS exposure" in

---

[87] Perfluorohexane Sulfonate (PFHxS) – *Socio-Economic Impact, Exposure and the Precautionary Principle Report*, IPEN Expert Panel (October 2019), https://ipen.org/sites/default/files/documents/pfhxs_socio-economic_impact_final_oct.2019.pdf.

[88] *Id.* at p. 25.

firefighters.[89]  "Of greater concern," the panel observed, "is that firefighter blood levels for

PFOS and PFHxS are many times higher than the median values for the general...population."[90]

125.    In June 2020, scientists at the University of Notre Dame published a ground-

breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear,

wore, or handle such gear ("Notre Dame Turnout Study").  The Notre Dame Turnout Study

analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by

six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell, over several

production years, as listed below:[91]

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

126.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or

personal protective equipment-PPE, as it is described in the study) are manufactured "from

textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS

in the form of side-chain fluoropolymers."[92]  According to the researchers, "[t]hese PFAS

---

[89] *Id.*

[90] *Id.*

[91] *Id.*, at fn. 7.

[92] *Id.*, at p. A.

include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[93]  The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[94]

| Environmental Science & Technology Letters | | | pubs.acs.org/journal/estlcu | | | | Letter |

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC–MS/MS Analysis

| values in ppb | jacket 2009 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
|---|---|---|---|---|---|---|---|---|
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.8 | 10.6 | 139 | 615 | 21.5 | 20.5 | 991 |
| PFPeA | <MDL | 12.6 | 17.8 | 22.8 | 104 | 164 | 18.1 | 2.49 |
| PFHxA | <MDL | 30.5 | 36.9 | 199 | 28.6 | 109 | 35.8 | 36.9 |
| PFHpA | <MDL | 12.4 | 25.4 | 105 | 5.82 | 2.23 | 143 | 25.4 |
| PFOA | 78 | 46 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 68.6 | <MDL | <MDL | 2.59 | <MDL |
| PFBS | 283 | 140 | 142 | 53400 | 47900 | 1050 | 230 | 90400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 25.9 | 12.9 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 11.1 | <MDL | <MDL | <MDL | <MDL |

127.  These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS.  The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

---

[93] *Id.*

[94] *Id.*, at p. C.

47

128. ·"Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[95] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water, and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen"[96] and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[97]

---

[95] *Id.*

[96] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-
PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[97] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.



Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

129.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[98]

130.    Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[99]

---

[98] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear*, Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/925236612/.

[99] Lion Customer Safety Alert – PFOA and Turnout Gear (April 24, 2019), https://cdn2.hubspot.net/hubfs/3475623/LION_PFOA_factsheet_042419.pdf.

131. The Customer Safety Alert goes on to stress that Lion does not use PFOA or

PFOS (two long-chain PFAS chemicals) in its turnouts.[100] It does not, however, address that

Lion's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about

health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW
ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products. The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.**

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PTFE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

132. As noted above, Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has

taken aim at the Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine

article about the study,[101] Chrostowski repeated Lion's website statement that "PFOA was never

part of the gear itself and frequent independent testing has found only trace amounts of it in any

of the gear – not nearly enough to cause concern, and in amounts similar to consumer

products."[102] Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-

---

[100] *Id.*

[101] Larissa Conroy, *What If I Told You That Your Bunker Gear Was Causing Cancer?*, Fire Rescue (May 28, 2020), https://www.firefighternation.com/firerescue/what-if-i-told-you-that-your-bunker-gear-was-causing-cancer/#gref.

[102] Paul Chrostowski, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims*, Fire Rescue (June 3, 2020). https://firerescuemagazine.firefighternation.com/2020/06/03/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/ - gref.

chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers."[103] Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."[104]

133. And yet, Lion has admitted publicly that dermal absorption is a pathway of exposure to cancer-causing chemicals for firefighters. In Lion's Not in Our House cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you



---

[103] *Id.*

[104] *Id.*

are, the more carcinogens your skin absorbs.[105] This statistic is alarming given that the core

body temperature of firefighters routinely increases during firefighting activities while wearing

turnouts which contain known carcinogens.[106]

134.    Likewise, Defendant Honeywell has stated: "The skin on the neck is very thin and

prone to absorbing carcinogenic particulates."[107]

135.    Another recent Harvard study examining PFAS levels in fire stations dust found

that "dust in turnout gear locker areas and adjoining apparatus bays had significantly higher

fluorine concentrations compared to living rooms in fire stations," as well as fluorine



---

[105] Lion website,
https://cdn2.hubspot.net/hubfs/3475623/NOT%20IN%20OUR%20HOUSE%20Tip%20Sheet_Infographi
c%20(02-02-19).pdf (last visited November 1, 2021).

[106] Nancy Espinoza, *Can We Stand the Heat?*, Journal of Emergency Medical Services, (April 30, 2008),
https://www.jems.com/operations/can-we-stand-heat-study-reveal/; Gavin P. Horn, et al., *Thermal
Response to Firefighting Activities in Residential Structure Fires: Impact of Job Assignment and
Suppression Tactic*, Ergonomics (July 31, 2017), https://tinyurl.com/4j2mz7f7.

[107] Ronnie Wendt, *Innovations in Turnout Gear*, Industrial Fire World (March 17, 2021),
https://www.industrialfireworld.com/598931/innovations-in-turnout-gear.

concentrations typically found in in Class B foam and/or textiles as opposed to consumer products.[108]

136. For years, the IAFF has held a yearly cancer summit and until 2021, had done little to address the PFAS in turnouts.109 Defendants, including at least DuPont, Gore, Lion and MSA/Globe, have been regular sponsors of the IAFF Cancer Summit.

137. At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to other chemicals encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout Defendants admitted that the PFAS materials in their products has been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm.

138. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages firefighters themselves to make a pledge to protect

---

[108] A.S. Young et al., Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust, J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.

[109] As alleged above, fn. 77, IAFF has only recently begun to take action related to PFAS exposure due to pressure from its firefighter members. At the IAFF Annual Meeting in January 2021, two groundbreaking PFAS-related firefighter safety resolutions passed with the support of 99% of the membership. The resolutions require IAFF to: (1) sponsor independent testing of turnouts for PFAS and PFAS-related hazards, (2) oppose the use of PFAS and PFAS-containing materials in turnouts, (3) require manufacturers to cease using PFAS in their firefighting products (4) identify which manufacturers will not cease using PFAS, (5) issue an advisory to fire departments to stop sending used or old turnouts to communities that are not able to buy new gear and instead provide grants to purchase new gear, and (6) cease accepting financial sponsorships from any PFAS/chemical-related companies unless it is to purchase PFAS-free turnout gear. Andrew Wallender, *PFAS Resolutions Overwhelmingly Approved by Firefighters' Union*, Bloomberg Law (February 1, 2021), https://news.bloomberglaw.com/daily-labor-report/pfas-resolutions-overwhelmingly-approved-by-firefighters-union; San Francisco Firefighters Cancer Prevention Foundation, (last visited September 30, 2021), https://www.sffcpf.org/resolutions-to-protect-members-from-toxic-substances-in-ppe/.

themselves from carcinogens linked to cancer ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer...") while all the while refusing to take any corporate responsibility for continually exposing firefighters to carcinogens in their protective gear.[110]

139.    Firefighter Plaintiff and all other firefighters deserve more. They are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, firefighters always put the community first. When a child is drowning in a pool or a family is caught in a burning house, they do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

### It Was Technologically and Economically Feasible for Defendants to Design Safer Firefighting Foams and Turnouts

140.    Defendants have long known that safer, reasonable, alternative designs existed and could be utilized. These designs are and were not only technologically feasible, but also economically. Indeed, given the enormous cost of remediation of the environment and litigation, not to mention the cost of human lives, the safe, feasible alternatives would have cost significantly less.

141.    In the early 2000s, 3M, in conjunction with Solberg Scandinavian AS developed Re-Healing Foam ("RF"), a high-performance, AFFF-comparable product that contained no

---

[110] Rachel Zoch, *Take A Pledge To Stop Cancer At the Door*, Fire Rescue 1 (January 28, 2019), https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-a-pledge-to-stop-cancer-at-the-door-e8bn7uAbtIXWdQau/.

fluorochemicals, and resulted in two patents and three commercial products of PFAS-free firefighting foam. RF met the standard of "ICAO [International Civil Aviation Organization] Level B and matched AFFF in performance including a US MIL-Spec product."[111]

142. In 2007, Solberg bought 3M's patent rights to RF and continued to market and sell RF.

143. In 2011, Defendant Amerex acquired Solberg and continued to manufacture, market, and sell RF.

144. In 2014, the EPA presented Solberg with the Presidential Green Chemistry Challenge Award for its fluorine-free foams; the award recognizes technologies that prevent pollution and match or improve the performance of existing products.[112]

145. In 2018, Defendant Perimeter Solutions acquired Solberg and continued to manufacture, market and sell RF.

146. Also, beginning in the early 2000s, BIOEX launched a highly effective, fluorine-free Class B F3 foam which has been approved and used by international airports, fire departments, oil and gas companies, the marine industry, and pharmaceutical and chemical

---

[111] *Fluorine Free Firefighting Foams (3F) – Viable Alternatives to Fluorinated Aqueous Film-Forming Foams (AFFF)*, IPEN Expert Panel (September 2018), https://ipen.org/sites/default/files/documents/IPEN_F3_Position_Paper_POPRC-14_12September2018d.pdf; Schaefer, Ted. H. et al., New Foam Technology, New Found Benefits, Solberg, IAFPA Sydney 2005 Conference Proceedings (Oct. 5-7, 2005), https://www.solbergfoam.com/getattachment/c5bef149-b850-48df-81a8-19b977c6daed/New-Foam-Technology,-New-Found-Results.aspx;

[112] Marc S. Reisch, *What Is the Price of Fire Safety?* As Lawsuits Pile Up and Government Pressure Rises, Firefighting-Foam Makers Reconsider the Environmental Cost of Fluorosurfactants, Chemical & Engineering News (January 14, 2019), https://cen.acs.org/business/specialty-chemicals/price-fire-safety/97/i2.

companies around the world.[113]

147.    However, lobbyists and companies invested in maintaining profits on fluorinated Class B foam not only continued to represent that PFAS-containing foam was safe, but also intentionally maligned the fluorine free foams, falsely asserting that these foams were less effective and more expensive.[114] As noted by IPEN:

> Over the years since the serious introduction on the market of Class B fluorine-free F3 foams suitable for hydrocarbon and polar solvent fires: there have been many attempts by the fluorochemical side of the industry and their lobbyist trade associations to undermine and downplay the operational performance of Class B fluorine-free foams whilst minimizing the environmental issues associated with fluorinated products. This has included publishing in the technical trade literature spurious performance tests carried out by non-independent or certified bodies funded by competitors to F3 producing companies, as well as continually perpetrating unsupported myths. It is these myths in particular that must be controverted for what they are: marketing hype, misrepresentation of test conditions, frank untruths or only partial truths, criticism of a competitor's product, and an exhibition of vested interests.[115]

148.    In 2011, the Fire Fighting Foam Coalition, which includes Defendants Tyco, DuPont, Dynax, Kidde, and Buckeye, misrepresented a U.S. Navy report comparing Solberg's

---

[113] *Fluorine Free Firefighting Foam (FFF) – Firefighting Foam Concentrates*, BIOEX website (last visited December 13, 2021), https://www.bio-ex.com/en/our-products/compositions/fluorine-free-foam/; "Major international hubs such as Dubai, Dortmund, Stuttgart, London Heathrow, Manchester, Copenhagen, and Auckland. All of the 27 major airports in Australia have transitioned to F3 foams, with airports in Europe such as Billund, Guernsey, Bristol, Blackpool, Koln Bonn also using F3 [fluorine-free] foams. Private sector companies using F3 foams include: BP, ExxonMobil, Total, Gazprom, Statoil, BHP Billiton, Bayern Oil, 3M, BASF, Chemours, AkzoNobel, Stena Line, Pfizer, Lilly, Weifa, JO Tankers, and ODFJEL. In the oil and gas sector F3 foams are being extensively, with Statoil in Norway having transitioned to F3 foams throughout all of it operations. Some military users including the Danish and Norwegian Armed forces have moved to F3 foams, with the Royal Danish Airforce transitioning to F3 foams several year ago." Fluorine Free Firefighting Foams (3F) – Viable Alternatives to Fluorinated Aqueous Film-Forming Foams (AFFF), IPEN Expert Panel, pg. 48 (September 2018), https://ipen.org/sites/default/files/documents/IPEN_F3_Position_Paper_POPRC-14_12September2018d.pdf

[114] *Id.*, at 20.

[115] *Id.*, at 22.

fluorine-free RF with Defendant National Foam's 6-Em AFFF and Defendant Buckeye's FC-3MS AFFF, asserting Solberg's RF was less effective. In fact, though Solberg's RF was not made per military specifications as it did not include fluorine, the U.S. Navy Report found:

> For iso-octane, the non-fluorinated foam had shorter extinguishment times than the two AFFFs and was the only foam to achieve an extinguishment time under 30 seconds....The non-fluorinated foam had substantially better performance on iso-octane than on any of the other fuels.
>
> Conclusions: For the AFFF foams which were intended to work via formation of an aqueous film, fire extinction times were lengthened considerably in cases where film formation was made difficult by the low surface tension of the fuel. For the non-filming fluorine-free foam, however, no such performance decrement was observed, and the fire extinction times on the lowest surface tension fuel were lower than for fuels with higher surface tensions, and within the 30 second time limit specified (on gasoline) by MIL-F-24385F.[116]

149. Further, the study found that AFFF foams had 25% drain times (between 4-6 minutes) whereas the fluorine-free RF's drain time was 12 minutes. This slower drain time leads to greater burn back resistance and greater safety for firefighters. The technology to develop safer, effective and economical fluorine-free Class B foam is and has been available for, at least, over 20 years. In fact, many firefighting foam manufacturers and distributors companies manufacture, market and/or sell fluorine-free firefighting foams, including Defendants Tyco, Perimeter Solutions, Chemguard, Johnson Controls, and National Foam.

150. EUROFEU, an umbrella organization representing fire protection trade associations and companies including Defendant Tyco, even stated in 2019: "We believe that F3s

---

116 *Re-Healing Foam Fire Performance*, Technical Bulletin, #1009, Solberg Foam, (last visited December 13, 2021), https://www.solbergfoam.com/getattachment/f8574423-9518-4888-a054-c170c0d9a234/RE-HEALING-Foam-Fire-Performance.aspx.

[fluorine-free foams] are very suitable for a growing number of applications such as municipal firefighting, training, some testing and as foam agents in first responding fire trucks."[117]

151.    LAST FIRE, a consortium of international oil companies developing best industry practice in storage tank Fire Hazard Management including Shell Oil, Chevron, BP, Exxon and Defendant Perimeter Solutions, concluded after conducting 200 tests that: "Fluorine free foams can provide equivalent performance to C6 foams [AFFF] and provide appropriate performance for hydrocarbon [fires]."[118]

152.    Safe fluorine-free turnout gear was and is also technologically and economically feasible.

153.    Defendant Fire-Dex manufactures, markets and sells an entire line of PFAS-free turnouts, as well non-fluorinated fabrics from Safety Components with a PFAS-free water-repellent.[119] "Made with the same fabric as our traditional TECGEN71 outer shell, this material is designed to reduce heat stress while offering the same performance levels in TPP, breathability, and overall reduction of composite weight."[120] Further, because of the increased breathability and thermal protection, the PFAS-free gear is the only outer shell that can currently

---

[117] *The Use of PFAS and Fluorine-Free Alternatives in Fire-Fighting Foams*, European Commission DG Environment and European Chemicals Agency (ECHA), Final Report, June 2020, p. 273, https://echa.europa.eu/documents/10162/28801697/pfas_flourine-free_alternatives_fire_fighting_en.pdf/d5b24e2a-d027-0168-cdd8-f723c675fa98

[118] *Id.*, at pp. 314-315. Hydrocarbon fires are flammable gas or liquid fires that may involve gas, oil, kerosene, ethanol, propane, acetylene, hydrogen, and methane, to name a few.

[119] Fire-Dex Launches Non-Fluorinated PPE Fabrics, Firehouse.com (February 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/firedex-firedex-launches-nonfluorinated-ppe-fabrics.

[120] Alternative PPE, Fire-Dex website, (last visited December 14, 2021), https://www.firedex.com/catalog/tecgen51-fatigues/#materials.

be paired with the lightest and thinnest thermal liners and moisture barriers.[121] This, according to Fire-Dex, significantly reduces heat stress and cardiac failure for firefighters while also reducing the risk of cancer and other diseases by eliminating PFAS exposure though turnout gear.

154. Defendants MSA/Globe, Honeywell, Tencate, and Gore have developed, manufactured, marketed and/or sold PFAS-free waterproofing technology, PFAS-free outer shells in turnout gear and/or durable PFAS-free fabrics.[122]

155. Defendant Honeywell even admitted that these PFAS-free alternatives are safe, feasible and economical: "Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way. The color fastness and wear remain the same."[123]

156. While the technology to develop fluorine-free turnout gear has been available for years, the NFPA 1971/1851 standards-setting technical committee continues to adhere to certain guidelines for turnout gear which require PFAS – knowingly putting firefighters at risk for exposure to PFAS. This committee is comprised of industry consultants, textile and gear manufacturers, including Defendants MSA/Globe, Lion, Tyco, and Honeywell.[124]

---

[121] TecGen71 Outer Shell, Fire-Dex website, (last visited December 14, 2021),https://www.firedex.com/tecgen71/.

[122] FreeFAS Durable Water Repellent (DWR) Coating, MSA/Globe website (last visited December 14, 2021), https://globe.msasafety.com/newoutershells; Id. at fn. 106, Wendt, Innovations in Turnout Gear, Industrial Fire World (March 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear;  WL Gore to Release PFAS-free Waterproof Material for Apparel, Chemical Watch (October 4, 2021), https://chemicalwatch.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel.

[123] Id., at fn. 106.

[124] NFPA 1971/1851 Technical Committee Meeting Minutes (March 31, 2020), https://www.nfpa.org/assets/files/AboutTheCodes/1971/1971_F2022_FAE_SPF_Pre-FD_MeetingMinutes_3_20.pdf; NFPA 1971/1851 Technical Committee Meeting Minutes (January 11-

157.    The economic and technological feasibility of fluorine-free foams and turnout gear is well-established and based on technology that has been available for years. The alternative designs detailed above are far safer for firefighters and eliminate the serious health risks that result from PFAS exposure.

158.    The only barrier to producing safer alternatives to PFAS-containing foams and turnout gear has been Defendants' opposition. Their continued manufacturing, marketing, selling and/or distributing PFAS-containing foams and turnout gear has exposed firefighters to toxic PFAS chemicals. These defective designs are and/or have been a substantial factor in causing Firefighter Plaintiffs' injuries.

159.    Based on all the foregoing, Plaintiffs bring this action for damages and for other appropriate relief sufficient to compensate them for the significant harm Defendants' PFAS chemicals and PFAS-containing products have caused.

**COUNT ONE**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY - DESIGN DEFECT**
**(MA. GEN. LAWS Ch. 106, § 2-314)**

160.    Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

161.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of designing, manufacturing, distributing, supplying, and/or selling turnouts and/or Class B foam and, by doing so, impliedly warranted that the turnouts and/or Class B foams were merchantable, safe, and fit for ordinary

---

12, 2012), https://www.nfpa.org/assets/files/aboutthecodes/1851/fae-spf_pre-rocmeetingminutes_01-12%20(2).pdf

purposes for which they were used, including for use by firefighters such as the Firefighter Plaintiff.

162.    Defendants knowingly placed PFAS and/or PFAS-containing turnouts and/or Class B foam into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and/or Class B foam to fire departments for use by firefighters such as the Firefighter Plaintiff, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities, including training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

163.    Defendants intended that the PFAS and/or PFAS-containing turnouts and/or Class B foam they were manufacturing, distributing, supplying, and/or selling would be used by firefighters, including the Firefighter Plaintiff, without any substantial change in the condition of the products from when the products were initially designed, manufactured, distributed, supplied, and/or sold by Defendants.

164.    The Firefighter Plaintiff used and/or was exposed to these PFAS-containing products in the ways that Defendants intended them to be used and for the ordinary purposes for which these products were intended.

165.    The Firefighter Plaintiff used and/or was exposed to these PFAS-containing products in ways that were foreseeable to Defendants.

166.    The Firefighter Plaintiff was exposed to PFAS by using Defendants' PFAS-containing turnouts and/or Class B foam in the course of their firefighting activities, as described above, without knowledge of the turnouts' and/or Class B foam's dangerous and hazardous properties.

167. ‧  The turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by Defendants and used by the Firefighter Plaintiffs, contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the turnouts and/or Class B foam are defective in design and/or are unreasonably dangerous, unsuitable, and not safe for use by firefighters even when used as directed by the manufacturer and for the intended purposes of firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

168.    Further, knowing of the dangerous and hazardous properties of turnouts and Class B foam, Defendants could have designed, manufactured, distributed, supplied, and/or sold reasonable alternative designs or formulations of turnouts and/or Class B foam that did not contain PFAS. Such alternative designs would have been safer for consumer-firefighters and would have reduced or prevented the Firefighter Plaintiffs' harm. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

169.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to the Firefighter Plaintiffs that was caused by the Defendants' design, manufacture, distribution, supply, and/or sale of PFAS and PFAS-containing materials, including turnouts and/or Class B foam.

170.    Additionally, the turnouts and/or Class B foam that were designed, manufactured, distributed, supplied, and/or sold by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, manufacturing,

distributing, supplying, and selling these products was unreasonably dangerous under the circumstances.

171. The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of PFAS-containing turnouts and/or Class B foam.

172. The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, did not meet ordinary consumer-firefighter's reasonable expectations as to their safety, and were more dangerous than an ordinary consumer-firefighter would expect.

173. The PFAS-containing turnouts and/or Class B foam were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants. Defendants PFAS-containing products were defective in the following ways:

- When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect.
- When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.
- When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

63

- When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.
- Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

174.   Defendants knew or should have known at the time of designing, manufacturing, distributing, supplying and/or selling their PFAS-containing turnouts and/or Class B foam, that exposure to PFAS by firefighters, including the Firefighter Plaintiffs, could result in cancer and other grave and serious illnesses and injuries as alleged herein.

175.   The unreasonably dangerous design defect in turnouts and/or Class B foam containing PFAS exposed the Firefighter Plaintiffs to toxic levels of PFAS and therefore, was a proximate cause of the Firefighter Plaintiff's injuries and damages as described herein.

176.   As a result of Defendants' design and formulation of a defective product, Defendants are liable in damages to Plaintiffs.

177.   As a direct and proximate result of the foregoing acts and omissions, Plaintiffs suffered the injuries and damages described herein.

178.   Defendants acted with willful or conscious disregard for the rights, health, and safety of the Firefighter Plaintiff, as described herein, thereby entitling the Firefighter Plaintiffs to an award of damages.

## COUNT TWO
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY–
## FAILURE TO WARN
## (MA. GEN. LAWS Ch. 106, § 2-314)

179.   Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

180.   Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of designing, manufacturing,

64

distributing, supplying, and/or selling of PFAS or PFAS-containing materials, including turnouts and/or Class B foam, and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and/or Class B foam to fire departments for the use by firefighters such as the Firefighter Plaintiffs, who were exposed to PFAS through ordinary and foreseeable uses for the purposes of firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

181.    The products complained of were designed, manufactured, distributed, supplied, and/or sold by each of the Defendants and/or used by and/or in the vicinity of the Firefighter Plaintiff during his lifetime and/or was exposed to PFAS while using turnouts and/or Class B foam in the ordinary course of performing his duties as firefighter.

182.    Defendants expected that the PFAS-containing products they were designing, manufacturing, distributing, supplying, and/or selling would reach firefighters, including the Firefighter Plaintiff, without any substantial change in the condition of the products from the time such PFAS-containing products were initially manufactured, sold, distributed, and marketed by Defendants.

183.    As set forth herein, Defendants knew or should have reasonably known that the turnouts and/or Class B foam containing PFAS that they designed, manufactured, distributed, supplied, or sold were hazardous to human health.

184.    Defendants knew or reasonably should have known of the dangers of the turnouts and/or Class B foams before, during and/or after their design, manufacture, distribution, supply and sale of those products.

185.   Defendants were required to warn users of the dangers that are present in the PFAS-containing turnouts and/or Class B foam that Defendants designed, manufactured, supplied, and/ or sold.

186.   The potential risks of using PFAS-containing turnouts and/or Class B foam presented a substantial danger to firefighters, including the Firefighter Plaintiff, when the turnouts and/or Class B foam were used and/or worn in an intended or reasonably foreseeable way.

187.   The Firefighter Plaintiff used and/or was exposed to Class B foam and/or wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing their duties as firefighters, including fire suppression and fire suppression training.

188.   Defendants' PFAS and PFAS-containing products, including turnouts and/or Class B foam, were in a defective condition and unreasonably dangerous by design and, are deleterious, toxic, and highly harmful to the Firefighter Plaintiff, as described herein.

189.   Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

   a.   Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts and/or Class B foam;

   b.   Did not have adequate instructions for safe use of the products;

   c.   Did not have warnings to persons, such as the Firefighter Plaintiff, who had been, or reasonably may have been, exposed to Defendants' turnouts and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

   d.   Did not manufacture, market, promote, distribute and/or sell reasonably comparable products not containing PFAS when it became feasible to design.

66

190.    Defendants knew that the use of turnouts and/or Class B foam, even when used as instructed by Defendants, subjected the Firefighter Plaintiff and others to a substantial risk of harm from PFAS or PFAS-containing materials, and yet, failed to adequately warn the Firefighter Plaintiff, the EPA, or the public.

191.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, and thereafter, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or Class B foam containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

192.    A reasonable person in Defendants' position and with Defendants' knowledge would have provided a warning as to the hazardous and toxic risks of PFAS to users of their PFAS-containing turnouts and/or Class B foams.

193.    Defendants also knew and/or could have identified the users of the turnouts and/or Class B foams to whom warnings should have been provided as they were firefighters, fire departments, fire districts and/or counties and municipalities who purchased the turnouts and/or Class B foam on behalf of, and for use by, firefighters in their duties.

194.    Defendants could have effectively communicated to users of the turnouts and/or Class B foams including but not limited to by package, container and gear labels, training of users, and dissemination of information materials.

195.    At all relevant times, Defendants' turnouts and/or Class B foam did not contain an adequate warning or caution statement, which was necessary.

196.    The Firefighter Plaintiff was unaware of the defective and unreasonably dangerous condition of Defendants' products at a time when such products were being used for

the purposes for which they were intended, and the Firefighter Plaintiff was exposed to PFAS released from the Defendants' turnouts and/or Class B foam.

197.    The Firefighter Plaintiff did not and could not have known that the use of turnouts and/or Class B foam in the ordinary course of performing their duties as firefighters could be hazardous to their health, bio-accumulate in the blood, and cause serious health effects, including cancer - dangers which were not obvious to the Firefighter Plaintiff.

198.    As a result of their inadequate warnings, Defendants' turnouts and/or Class B foam were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by the Firefighter Plaintiff.

199.    The lack of adequate and sufficient warnings was a substantial factor in causing the Firefighter Plaintiff's harm and injuries, as described herein.

200.    As a result of Defendants' failure to provide adequate and sufficient warnings, Defendants are strictly liable in damages to the Firefighter Plaintiff.

201.    As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiff suffered the injuries and damages described herein.

## COUNT THREE
## NEGLIGENCE

202.    Plaintiffs incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

203.    Defendants owed a duty of care towards the Plaintiffs that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of Class B foam and turnouts containing PFAS or PFAS-containing materials.

204.    Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of Class B foam and/or turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of the Firefighter Plaintiff and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

205.    Defendants had a duty to exercise reasonable care to ensure that Class B foam and/or turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of Class B foam and/or turnouts were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

206.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foam and/or turnouts.  However, Defendants knowingly and intentionally failed to do so.

207.    Defendants failed to exercise a reasonable degree of ordinary care in the designing, researching, testing,  manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing products in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing materials was hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

69

208. Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer, as set forth herein.

209. Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the Class B foam and/or turnouts products.

210. Defendants negligently, carelessly, and recklessly recommended application and disposal techniques for PFAS and/or for products containing PFAS that directly and proximately caused harm to the Firefighter Plaintiff.

211. Defendants knew or should have known that firefighters working with and using Class B foam and/or turnouts products would be exposed to PFAS.

212. At all times material, the Firefighter Plaintiff inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' Class B foam and/or turnouts.

213. The Firefighter Plaintiff's exposure to Defendant's Class B foam and/or turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing products, was harmful and substantially increased the risk of injuries to the Firefighter Plaintiff and did cause injuries to the Firefighter Plaintiff.

214. Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling Class B foam and/or turnouts containing PFAS or PFAS-containing materials would result in harm to the Firefighter Plaintiff as a result of using Class B foam and/or turnouts in the ordinary course of performing the Firefighter Plaintiff's duties as a firefighter.

215. Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in Class B foam and turnouts, and/or Defendants' other acts and/or omissions as described in this complaint, could likely result in PFAS exposure to the Firefighter Plaintiff, the persistence and accumulation of toxic and harmful PFAS in their blood and/or bodies, and cause injuries to the Firefighter Plaintiff as herein alleged.

216. The harm from PFAS-containing turnouts and/or Class B foam to the Firefighter Plaintiff could have been reduced or eliminated by the adoption of safer, reasonable alternative designs that were not unreasonably dangerous, that were known and available to Defendants.

217. These reasonable alternative designs or formulations of turnouts and/or Class B foam do not contain PFAS and therefore are safer for consumers and would have reduced or prevented the Firefighter Plaintiff's harm. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible, and do not interference with the performance of the products.

218. Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to the Firefighter Plaintiff, the persistence and accumulation of toxic and harmful PFAS in their blood and/or bodies, and caused injuries to the Firefighter Plaintiff as herein alleged.

219. Defendants, through their acts and/or omissions as described in this complaint, breached their duties to the Firefighter Plaintiff.

220.    It was reasonably foreseeable to Defendants that the Firefighter Plaintiff would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

221.    As a direct and proximate result of the foregoing acts and omissions, the Firefighter Plaintiff suffered the injuries described herein, which are permanent and lasting in nature, include physical pain and mental anguish, the need for lifelong medical treatment, monitoring, and/or medications. But for Defendants' negligent acts and/or omissions, the Firefighter Plaintiff would not have been injured or harmed.

**COUNT FOUR**
**LOSS OF CONSORTIUM**

222.    The Spouse Plaintiff incorporates by reference all prior paragraphs of this complaint, as though fully set forth herein.

223.    At all times relevant to this action, the Spouse Plaintiff Amanda Gibson and Firefighter Plaintiff Kenneth Gibson were and are now lawfully married.

224.    As alleged above, and as a result of the conduct of the Defendants, Firefighter Kenneth Gibson sustained severe and permanent injuries and damages.

225.    As a proximate result of her husband's injuries sustained from the exposure to and/or use of Class B foam and/or turnouts in the ordinary course of performing his firefighting duties, the Spouse Plaintiff was deprived of love, companionship, comfort, care, assistance, protection, affection, society, moral support, sexual relations and conjugal fellowship, during her husband's illnesses, treatments and recoveries, which deprivation has caused, continues to cause, and in the future is expected to cause the Spouse Plaintiff emotional distress; loss of earning capacity; past, present, and future, and other injuries - the full extent of which has not yet been ascertained, but which will be stated according to proof at trial.

226.    As a further direct and proximate result of the aforesaid conduct of Defendants, the Spouse Plaintiff has sustained a loss of consortium, love, society, comfort, and affection, and has thereby sustained pecuniary losses, which losses will be stated according to proof at trial.

**COUNT VI**
**DECEPTIVE TRADE PRACTICES**

227.    Plaintiffs hereby incorporate by reference each and every paragraph set forth in this Complaint as if fully copied and set forth here in their entirety.

228.    As alleged above, Defendants sold and marketed the PFAS or PFAS-containing materials in Class B foam and turnouts with defective and unreasonably dangerous designs and with insufficient and improper warnings.

229.    Defendants improperly marketed and sold the PFAS or PFAS-containing materials in Class B foam and turnouts in violation of the *Massachusetts Consumer Protection Act, M.G.L. c. 93A, §2.*

230.    Defendants' conduct was unfair and deceptive in that it impliedly or expressly misrepresented their PFAS or PFAS-containing materials in Class B foam and turnouts as being safe and effective for use by patients, including the Plaintiff. Contrary to Defendants' representations, the PFAS or PFAS-containing materials in Class B foam and turnouts was not safe or appropriate when used for its intended purposes.

231.    Plaintiffs suffered the aforementioned injuries and damages as a direct result of Defendants' violation of the Massachusetts Consumer Protection Act and Plaintiffs are entitled to any and all damages and recovery authorized pursuant to the Massachusetts Consumer Protection Act.

73

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court grant the following relief:

1. Compensatory damages, including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount according to proof at time of trial;

2. Compensatory damages for future damages, including but not limited to Plaintiffs' pain and suffering and for severe permanent personal injuries sustained by the Firefighter Plaintiffs, including for future health care costs, medical monitoring, and/or economic loss.

3. Economic damages including but not limited to medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

4. Double or treble damages, pursuant to Mass. Gen. Law 93A for the wanton, willful, fraudulent, and reckless acts of the Defendants, who demonstrated a conscious disregard and reckless indifference for the safety and welfare of the public in general and of the Plaintiffs in particular, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;

6. Attorneys' fees and costs pursuant as permitted by law; and

7. Any such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for each cause of action for which they are entitled to a jury trial.

DATED: February 15, 2022

Respectfully submitted,

The Plaintiffs
By their attorney,

Paula Bliss, Esq. (BBO #652361)
JUSTICE LAW COLLABORATIVE, LLC
19 Belmont Street
South Easton, MA 02375
Tel: 508-230-2700
Email: paula@justiceIc.com

74